RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE _8_ / _13_ / _14_

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

---

LOUISIANA COLLEGE                         CIVIL ACTION NO. 12-0463

-vs-                                                              JUDGE DRELL

KATHLEEN SEBELIUS, et al.           MAGISTRATE JUDGE KIRK

## RULING

Before the Court are Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (Doc. 81) and Plaintiff's Cross-Motion for Summary Judgment (Doc. 91). Plaintiff asked the Court to decide the pending motions without oral argument, and the Government did not object to proceeding in this manner. (See Docs. 102 & 105). By minute entry on January 9, 2014 (Doc. 105), the Court agreed that motion to dismiss and cross-motions for summary judgment would be decided on the briefing presently before us without the necessity of oral argument. Accordingly, we have considered the filings and evidence in the record and the parties' arguments contained in their briefs and are prepared to rule on the pending motions in turn. For the following reasons, we find that Plaintiff is entitled to summary judgment as to its Religious Freedom and Restoration Act claim.

## I.    Background

Under the Patient Protection and Affordable Care Act of 2010, 124 Stat. 119 ("ACA" or "the Act"), non-exempt employment-based group health plans are required to provide cost-free coverage for all contraceptive methods approved by the Food and Drug Administration ("FDA"), four of which may prevent a fertilized egg from attaching

to the uterine wall ("contraceptive mandate" or "mandate"). However, recently-promulgated regulations provide a mechanism for certain religious nonprofits to avoid providing coverage for contraceptive services they find religiously offensive by executing a required self-certification form ("challenged regulations").[1] This mechanism—known as the "accommodation"—requires an insurance issuer, upon receipt of the self-certification, to exclude contraceptive coverage from the employer's plan and to provide plan participants with separate payments for contraceptives without imposing any cost-sharing requirements on the employer, its insurance plan, or the plan beneficiaries.

Plaintiff, Louisiana College ("LC"), is a nonprofit university affiliated with the Southern Baptist Convention ("SBC").[2] Plaintiff believes as a matter of faith that human life begins at the moment of conception, or when an egg becomes fertilized. It is therefore against Plaintiff's religious beliefs to participate in or facilitate access to abortion or "abortifacient"[3] drugs, which Plaintiff believes can end human life and are

---

[1]  To be clear, we use the term "challenged regulations" to refer collectively to the federal regulations imposing the contraceptive mandate and the accommodation. These regulations include: 26 C.F.R. § 54.9815–2713(a)(1)(iv); 26 C.F.R. § 54.9815–2713A(a); 29 C.F.R. § 2590.715–2713(a)(1)(iv); 29 C.F.R. § 2590.715–2713A(a); 45 C.F.R. § 147.130(a)(1)(iv); and 45 C.F.R. § 147.131(b).

[2]  The SBC is a national association of Christian churches and missions "that share common religious beliefs, including support for the sanctity of human life from conception to natural death, and opposition to abortion and abortion-inducing drugs." Reaching Souls Int'l v. Sebelius, No. 13-cv-1092, 2013 WL 6804259, at *2 (W.D. Okla. Dec. 20, 2013).

[3]  Plaintiff uses the term "abortifacient" to describe four contraceptive methods that may operate after the fertilization of an egg. (Plaintiff's Statement of Material Facts, Doc. 91-1 at p. 2). These include two forms of emergency contraception, Plan B and Ella, commonly known as the "morning after" pills, and two types of intrauterine devices. As the Supreme Court noted in Burwell v. Hobby Lobby Stores, Inc., 134 S.Ct. 2751, 2014 WL 2921709, at *9 n.7 (U.S. June 30, 2014), however, those "who believe that life begins at conception regard these four methods as causing abortions, but federal regulations, which define pregnancy as beginning at implantation, see, e.g., 62 Fed. Reg. 8611 (1997); 45 CFR § 46.202(f) (2013), do not so classify them." This distinction is relevant because, like the plaintiffs in Hobby Lobby, Louisiana College's objection is limited to contraceptive methods that may prevent uterine implantation or otherwise harm a fertilized embryo. (Second Amended Complaint, Doc. 77 at ¶¶ 2, 28–29). Plaintiff does not object to contraceptive methods that merely prevent ovulation or fertilization,

therefore sinful. Consistent with these beliefs, Plaintiff provides health care benefits to its employees through a group health plan sponsored by GuideStone Financial Resources[4] ("GuideStone Plan"), and has excluded from coverage "contraceptive drugs or devices considered to be abortifacients." Reaching Souls Int'l v. Sebelius, No. 13-cv-1092, 2013 WL 6804259, at *2 (W.D. Okla. Dec. 20, 2013).

Plaintiff filed the instant suit against the U.S. Department of Health and Human Services ("HHS") and other federal officials and agencies (collectively, "Defendants") under the Religious Freedom Restoration Act ("RFRA"), the First Amendment Free Exercise, Establishment, Free Speech, and Freedom of Association clauses, the Fifth Amendment Due Process Clause, and the Administrative Procedure Act ("APA"), seeking to enjoin application of the ACA's contraceptive mandate under the challenged regulations. Plaintiff maintains that compliance with the challenged regulations, including the accommodation, violates its sincerely-held religious beliefs because, by self-certifying, it would trigger and facilitate its employees' free access to emergency contraceptive drugs and devices, which is tantamount to facilitation of sins against human life and is forbidden by its religion. Plaintiff also maintains that choosing to follow

---

such as prescription oral contraceptives. (Plaintiff's Statement of Material Facts, Doc. 91-1 at pp. 2–3).

[4] GuideStone Financial Resources
   is a nonprofit corporation formed and controlled by the [SBC]; it is a tax-exempt church benefits board that assists churches and other religious organizations by facilitating retirement plan services, health benefits coverage, risk management, and other benefit programs. GuideStone established the GuideStone Plan as a multiple-employer, self-insured health plan that qualifies as a "church plan" and thus is not subject to ERISA. Consistent with the religious convictions of the [SBC], the GuideStone Plan does not cover expenses associated with the elective termination of a pregnancy, including contraceptive drugs or devices considered to be abortifacients. GuideStone has agreements with two corporations, one of which is Highmark Health Services, to provide claims administrative services.
Reaching Souls, 2013 WL 6804259 at *2.

3

the commands of its faith, and thereby failing to comply with the challenged regulations, would result in crippling financial penalties, which is a quintessential substantial burden on the free exercise of religion.

On November 2, 2013, Defendants filed the instant Motion to Dismiss or, in the Alternative, for Summary Judgment as to all of Plaintiff's claims. (Doc. 81).[5] In response, Plaintiff cross-moved for summary judgment (Doc. 91) and opposed Defendants' motion (Doc. 92). Defendants then filed a reply, combined with a memorandum in opposition to Plaintiff's cross-motion (Doc. 96), to which opposition Plaintiff has replied (Doc. 100).

On December 2, 2013, Plaintiff filed a motion for a preliminary injunction, seeking relief on the basis of its RFRA claim. (Doc. 94). However, on December 20, 2013, the U.S. District Court for the Western District of Oklahoma issued a preliminary injunction barring enforcement of the mandate and accommodation against "any employers who provide medical coverage to employees under the GuideStone Plan and who are 'eligible organizations.'" Reaching Souls, 2013 WL 6804259 at *8. In light of this decision, Plaintiff filed an unopposed motion to withdraw its preliminary injunction request on January 6, 2014. (Doc. 102). The following day, the Court ordered Plaintiff's motion for preliminary injunction withdrawn, reserving to Plaintiff the right to file a new motion in the event the Reaching Souls injunction is modified. (Doc. 104).

───────────────────────

[5] While Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), or in the alternative, for summary judgment, the Court must consider matters outside the pleadings in order to reach its decision. Therefore, pursuant to Fed. R. Civ. P 12(d), we must analyze the instant motion as one for summary judgment under Rule 56(c). To the extent Defendants move to dismiss Plaintiff's claims under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, Rule 12(d) does not apply. However, the motion to dismiss under Rule 12(b)(1) appears to be directed only to Plaintiff's claim that certain regulations were not promulgated in compliance with the APA. (See Doc. 81-1 at p. 8). For the reasons discussed herein, we find that Plaintiff is entitled to summary judgment as to its RFRA claim, and this resolution precludes the need to rule on any remaining issues.

4

### A.    The Plaintiff

Louisiana College was established in Pineville, Louisiana on October 3, 1906, and is the successor to two earlier Louisiana Baptist colleges: Mt. Lebanon University, an all-male college founded in 1852 by the North Louisiana Baptist Convention; and Keatchie Female College, a women's college founded in 1857 by the Grand Cane Association of Baptist Churches. After years of financial difficulties, the Louisiana Baptist Convention ("Convention")[6] took control of both predecessor schools in 1899. The Convention selected an Education Commission to administer the schools, with the understanding that a more centrally-located campus would be selected and a new school would be founded to succeed them. The Education Commission continued to administer Louisiana College until 1921, when it was replaced by a new governing body, the Board of Trustees. Board members are chosen by the Convention and must be members in good standing of a Louisiana Baptist church that cooperates with the Convention.

Christian faith is claimed as central to the identity and administration of Louisiana College. LC is a private, coeducational institution chartered as a "non-profit corporation with the object 'to own, operate and conduct a Baptist college to foster Christian education.'" (LC Academic Catalog, Doc. 91-4, Exh. L at p. 5). The mission of LC is "to provide liberal arts, professional, and graduate programs characterized by devotion to the preeminence of the Lord Jesus, allegiance to the authority of the Holy Scriptures, dedication to academic excellence for the glory of God, and commitment to change the

---

[6]  The Convention is "a state-wide organization consisting of cooperating and autonomous Baptist churches, the purpose of which is to advance the cause of Christ in the world, in cooperation with the [SBC]." (LC Faculty Handbook, Doc. 91-4, Exh. I at p. 12).

world for Christ by the power of the Holy Spirit." (Id. at 6). LC also seeks "to create a supportive environment in which students 'are encouraged to develop an active Christian commitment.'" (LC Christian Commitment Statement, Doc. 91-4, Exh. H). In accordance with this mission, LC "recruits faculty and staff who are committed followers of Christ, who participate actively in a local church, and who are aware of and will teach or perform professionally in harmony with the doctrinal statement." (LC Academic Catalog, Doc. 91-4, Exh. L at p. 8). LC has approximately 180 full-time employees and 80 part-time employees who are to "exemplify a Christian lifestyle characterized by the highest standard of Christian morality by exhibiting the character of Christ and living according to the ethical principles affirmed by Holy Scripture." (LC Christian Commitment Statement, Doc. 91-4, Exh. H; Second Amended Complaint, Doc. 77 at ¶ 35).

Included in these principles is a belief that "[c]hildren, from the moment of conception, are a blessing and heritage from the Lord." (LC Academic Catalog, Doc. 91-4, Exh. L at p. 19). LC adheres to the 2000 Baptist Faith and Message of the SBC as its doctrinal statement, including the commandment to "speak on behalf of the unborn and contend for the sanctity of all human life from conception to natural death." (Id. at 18). LC believes and teaches that human life begins when an egg becomes fertilized, and that abortion, or methods that harm a fertilized human embryo, ends human life and is a sin. (Second Amended Complaint, Doc. 77 at ¶¶ 2, 28–29, 31, 171). Thus, LC objects to the use of emergency contraceptives, believing that such drugs and devices cause the death of a fertilized embryo. In addition, LC believes that facilitating transgressions of God's law concerning the dignity of human life is equally immoral and sinful, and that

6

sin disrupts its relationship with God. LC therefore states that it "seeks to avoid facilitating sinful behavior, thereby engaging in immoral conduct itself," and that its religious beliefs "prohibit it from providing, paying for, making accessible, or facilitating coverage or payments for abortion, abortifacients, embryo-harming pharmaceuticals, and related education and counseling, or providing or facilitating a [health insurance] plan that causes access to the same through an insurance company, third-party administrator, or any other party." (Plaintiff's Memorandum in Support, Doc. 92 at p. 16; Second Amended Complaint, Doc. 77 at ¶ 170).

Consistent with its religious beliefs, LC provides its employees and their dependents with health insurance coverage through the GuideStone Plan. This plan "provides group health benefits on a self-insured basis for organizations associated with the [SBC], which share its religious views regarding abortion and contraception, and [which] rely on GuideStone to provide coverage consistent with those views." (Motion to Withdraw, Doc. 102 at p. 2) (quoting Reaching Souls, 2013 WL 6804259 at *1). Accordingly, the plan does not cover emergency contraceptive drugs and devices.[7]

**B.     The Affordable Care Act**

At issue in the present case are HHS regulations promulgated under the Patient Protection and Affordable Care Act of 2010 that result in the provision of health insurance coverage for emergency contraceptive drugs and devices at no additional cost to Plaintiff's employees.

---

[7] LC's employee health plan does include coverage for other contraceptive methods that only prevent ovulation. (Plaintiff's Statement of Material Facts, Doc. 91-1 at p. 3).

ACA generally requires employers with 50 or more full-time employees to offer a group health plan or group health insurance coverage that provides "minimum essential coverage," or incur financial penalties. 26 U.S.C. § 5000A(f)(2); §§ 4980H(a), (c)(2). Specifically, if a covered employer offers group health insurance coverage, but its plan fails to comply with the ACA's requirements for group health plans, the employer may be required to pay a regulatory tax of $100 per day for "each individual to whom such failure relates" ("regulatory tax"). Id. § 4980D(b)(1). Likewise, if the employer fails to provide group health insurance coverage altogether, and at least one of its full-time employees enrolls in a health plan and qualifies for a subsidy on one of the government-facilitated exchanges, the employer must pay an annual assessable payment of $2000 per full-time employee, minus 30 ("assessable payment"). Id. §§ 4980H(a), (c)(1), (d)(1).

Unless an exception applies, ACA further mandates that any employment-based "group health plan" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), or "health insurance issuer offering group or individual health insurance coverage" provide coverage for "preventive care and screenings" for women without imposing "any cost sharing requirements" on plan participants and beneficiaries. 42 U.S.C. § 300gg-13(a)(4). However, Congress did not define "preventive care" and instead authorized the Health Resources and Services Administration ("HRSA"), a component of HHS, to develop "comprehensive guidelines"  for covered "preventive care and screenings." Id. HRSA in turn consulted the Institute of Medicine ("IOM"), a nonprofit, non-governmental health-policy organization and arm of the National Academy of Sciences, to "review what preventive services are necessary to

8

women's health and well-being and should be considered in the development of comprehensive guidelines." Institute of Medicine, <u>Clinical Preventive Services for Women: Closing the Gaps</u>, Washington, DC: The National Academies Press (July 19, 2011), 11 ("IOM Report").[8] IOM made eight recommendations for preventive services for women, including coverage for "the full range of [FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." <u>Id.</u> at 10, 109–10.

In August 2011, HRSA promulgated guidelines adopting the IOM recommendations in full,[9] thereby requiring employment-based group health plans to provide coverage, without cost sharing, for all FDA-approved contraceptive methods and related services, subject to a religious-employer exemption authorized by amended interim final regulations issued at the same time. See 76 Fed. Reg. 46,621-01 (Aug. 3, 2011). The FDA has approved 20 contraceptive methods ranging from prescription oral contraceptives and intrauterine devices ("IUDs") to emergency contraceptives and sterilization surgery. While most FDA-approved contraceptive methods function by preventing fertilization of an egg, four of those methods—the emergency contraceptive drugs Plan B and Ella, commonly known as the "morning after" pills, and two types of IUDs—may have the effect of preventing attachment or implantation of a fertilized egg

---

[8]  The IOM Report is attached as an exhibit to Defendants' motion to dismiss and for summary judgment (Doc. 81) ("Doc. 81 Exhibits") and was provided to the Court on a compact disk. The report may also be read online for free at http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.apx.

[9]  <u>See</u> HRSA, "Women's Preventive Services Guidelines," http://www.hrsa.gov/womensguidelines (last visited July 8, 2014) (Doc. 81 Exhibits at pp. 283–84).

to the uterine wall (collectively, "emergency contraceptives"). See FDA, "Birth Control: Medicines to Help You."[10]

HHS also authorized HRSA to establish an exemption from the mandate for group health plans "established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines." 45 C.F.R. § 147.131(a); see also 76 Fed. Reg. at 46,623–24. The term "religious employer" includes "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order." 45 C.F.R. § 147.131(a) (citing 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii)).

During a one-year safe harbor period, and in response to objections that the religious-employer exemption was too narrow, HHS undertook new rulemaking to develop an accommodation for certain religious nonprofit organizations, known under the regulations as "eligible organizations." See 77 Fed. Reg. 16,501, 16,503 (Mar. 21, 2012). The accommodation was intended to satisfy two goals: (1) "providing contraceptive coverage without cost-sharing to individuals who want it;" and (2) "accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services." 77 Fed. Reg. 8725-01, 8727 (Feb. 15, 2012). To qualify for this accommodation, the "eligible organization" must self-certify, before the commencement of the first plan year to which the accommodation applies, that it satisfies the following eligibility criteria:

_____

[10] Online at http://www.fda.gov/forconsumers/byaudience/forwomen/freepublications/ucm313215.htm (last visited July 8, 2014).

(1)     The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2)     The organization is organized and operates as a nonprofit entity.

(3)     The organization holds itself out as a religious organization.

45 C.F.R. § 147.131(b), (d). The self-certification must be executed in the appropriate form and manner "by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with" ERISA's record-retention requirements. Id. § 147.131(b)(4). In addition, the organization must submit a copy of the self-certification to its group health insurance issuer ("issuer") or third-party administrator ("TPA"). If the organization complies with these requirements, it is deemed to have complied with the mandate and will not incur any statutory penalties. 26 C.F.R. § 54.9815-2713A(b), (c).

Upon receipt of the organization's self-certification, the issuer must:

(1)     Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and

(2)     Provide separate payments for any contraceptive services required to be covered under § 147.130(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.

45 C.F.R. § 147.131(c)(2)(i). The issuer is then required to provide contraceptive coverage to the organization's employees and their dependents at no cost to the plan participants or beneficiaries, the group health plan, or the eligible organization.[11] The issuer must

---

[11] In Hobby Lobby, the Supreme Court observed that "[a]lthough this procedure requires the issuer to bear the cost of these services, HHS has determined that this obligation will not impose any net expense on issuers because its cost will be less than or equal to the cost savings resulting from the

separate the revenues collected from the organization's premium payments from the monies used to pay for contraceptive services, and it must ensure that no premium revenues are used to pay for these services. Id. § 147.131(c)(2)(ii). Moreover, the issuer must give plan participants and beneficiaries written notice specifying that the organization does not administer or fund contraceptives, but that the issuer will provide separate payments for such services.[12] Id. § 147.131(d).

In addition to these exceptions for religious organizations, the ACA "exempts a great many employers from most of its coverage requirements." Burwell v. Hobby Lobby Stores, Inc., 134 S.Ct. 2751, 2014 WL 2921709, at *9 (U.S. June 30, 2014). For example, employers sponsoring "grandfathered" health plans—those that were in effect on March 23, 2010, and to which no significant changes have been made after that date—need not comply with many of the ACA's provisions, including the contraceptive mandate. 42 U.S.C. § 18011(a)(2), (e). Although this provision was intended merely to "ease the transition of the healthcare industry into" the Act's requirements, 75 Fed. Reg. 34,538, 34,540–41 (June 17, 2010), "[o]ver one-third of the 149 million nonelderly people in America with employer-sponsored health plans were enrolled in grandfathered plans in

---

services." 2014 WL 2921709 at *9 (citing 78 Fed. Reg. at 39,877). Nothing in this case requires a testing of that conclusion.

[12] If the organization sponsors a self-insured group health plan, the TPA must provide or arrange for payments for contraceptive services, a requirement imposed through the Department of Labor's ERISA enforcement authority. 78 Fed. Reg. 39,870, 39,874, 39,879–80 (July 2, 2013); see also 26 C.F.R. § 54.9815-2713A; 29 C.F.R. §§ 2510.3-16, 2590.715-2713A. The organization's self-certification is "treated as a designation of the [TPA] as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA," so the TPA must provide or arrange payments for contraceptive services "without cost sharing, premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan." 78 Fed. Reg. at 39,879–80. See also 26 C.F.R. § 54.9815-2713A(b)(2). However, the TPA may seek reimbursement for contraceptive payments through adjustments to its federally-facilitated Exchange user fees. 26 C.F.R. § 54.9815-2713A(b)(3).

2013." <u>Hobby Lobby</u>, 2014 WL 2921709 at *10 (citations omitted). Moreover, employers with less than 50 full-time employees are not required to provide their employees with health insurance coverage at all. 26 U.S.C. § 4980H(c)(2). The number of people working for such employers is approximately 34 million. Accordingly, the mandate "presently does not apply to tens of millions of people." <u>Hobby Lobby</u>, 2014 WL 2921709 at *10 (quotations and citation omitted).

### C.   Application of the Challenged Regulations to Plaintiff

The parties agree that Plaintiff is not eligible for the religious-employer exemption, and that Plaintiff's employee health plan does not possess grandfathered status. The parties also agree that Plaintiff would qualify as an "eligible organization" entitled to the accommodation, provided that it fulfills the self-certification requirement. Nevertheless, Plaintiff avers that the challenged regulations offend RFRA and the Constitution because they place a substantial burden on its freedom to follow the commands of its faith, which "forbid [it] from participating *in any way* in the government's scheme to provide free access to [emergency contraceptives] through its health care plans." (Second Amended Complaint, Doc. 77 at ¶ 142) (emphasis added). Plaintiff further argues that this burden is not the least restrictive means of advancing a compelling governmental interest.

According to Plaintiff, the challenged regulations substantially burden its religious exercise by forcing it to choose among the following options: (1) maintaining its current health insurance plan, which does not provide coverage for or facilitate access to the objectionable drugs and services; (2) dropping employee health insurance altogether to avoid facilitating access to emergency contraceptives; or (3) complying with the

13

mandate, and thereby facilitating access to drugs and services that (according to Plaintiff) can destroy human life. Plaintiff contends that the ACA makes the first and second options untenable because they result in crippling financial penalties, leaving Plaintiff "without the option of fulfilling its religious convictions by providing health insurance coverage that does not facilitate access to" emergency contraceptives. (Plaintiff's Memorandum in Support, Doc. 92 at p. 17).

Under the first option, the most immediate consequence would come in the form of a $100 per day regulatory tax for each "individual to whom such failure [to provide contraceptive coverage] relates." 26 U.S.C. § 4980D(b)(1). Given its full-time workforce of 180 employees, Plaintiff claims this would amount to a total of $6,570,000 in annual tax penalties. It also would be exposed to possible regulatory action and private lawsuits. See 29 U.S.C. §§ 1132, 1185d. Under the second option, Plaintiff would face an assessable payment of $2000 per full-time employee, minus 30, which would total approximately $300,000 per year based on Plaintiff's estimate. See 26 U.S.C. §§ 4980H(a), (c)(1), (d)(1).

Finally, Plaintiff contends that the third option—compliance with the mandate—requires it to violate its sincerely-held religious beliefs. Under this option, Plaintiff would be required to execute and submit to its insurance issuer a self-certification on a government prescribed form stating its religious objection to the mandate in order to avoid paying or providing coverage for emergency contraceptives directly (or through is affiliated GuideStone Plan).[13] But, according to Plaintiff, self-certification "ensures the same result" as providing the coverage directly: free access

---

[13] Defendants do not appear to dispute that requiring Plaintiff to provide direct coverage for emergency contraceptives, without the accommodation, would amount to a substantial burden on the free exercise of religion.

to emergency contraceptives for its employees as a direct consequence of their employment with Plaintiff and their participation in its employee health plan. (Plaintiff's Memorandum in Support, Doc. 92 at p. 18). Plaintiff claims that completing and delivering the self-certification "specifically causes" its insurer to "arrange payment for" emergency contraceptives, thereby making Plaintiff the "essential cog" in the scheme by which its employees receive such contraceptives and which is tantamount to an endorsement or facilitation of these drugs and devices. (Second Amended Complaint, Doc. 77 at ¶¶ 5, 116; Plaintiff's Memorandum in Support, Doc. 92 at p. 25). Compliance with the mandate, Plaintiff argues, is therefore sinful and immoral in itself.

Defendants do not challenge Plaintiff's religious beliefs or the manners in which it exercises those beliefs. Instead, Defendants assert that the challenged regulations impose no more than a *de minimis* burden on religious exercise because they do not require Plaintiff to take action beyond what it did or would do under different circumstances. Alternatively, Defendants argue that any burden is too attenuated to qualify as substantial.

### D.   Recent Free-Exercise Challenges to the Challenged Regulations

A number of courts have addressed similar free exercise claims by religious nonprofits that are eligible for the accommodation, but with varying results. While the Fifth Circuit has yet to weigh in on the issue definitively, at least three district courts in this circuit have considered whether to grant injunctive relief on such claims, and all three have ruled in favor of the nonprofit plaintiffs. See, e.g., Catholic Diocese of Beaumont v. Sebelius, No. 1:13-cv-709, 2014 WL 31652 (E.D. Tex. Jan. 2, 2014); Roman

Catholic Diocese of Fort Worth v. Sebelius, No. 4:12-cv-314 (N.D. Tex. Dec. 31, 2013) (ECF

Doc. 99); E. Tex. Baptist Univ. v. Sebelius, 988 F. Supp. 2d 743 (S.D. Tex. Dec. 27, 2013)

("ETBU"). On these facts, we join with the reasoning of our sister concur in concluding

that the challenged regulations offend RFRA by placing a substantial burden on Plaintiff

to act in ways that (as Plaintiff sees it) involve it in the provision of emergency

contraceptives, and thereby require Plaintiff to violate its sincerely-held religious beliefs.

Therefore, we find the challenged regulations—26 C.F.R. § 54.9815–2713(a)(1)(iv); 26

C.F.R. § 54.9815–2713A(a); 29 C.F.R. § 2590.715–2713(a)(1)(iv); 29 C.F.R. §

2590.715–2713A(a); 45 C.F.R. § 147.130(a)(1)(iv); and 45 C.F.R. § 147.131(b)—cannot

stand.

## II.   **Summary Judgment Standard**

A court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party. See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider "all evidence in

the light most favorable to the party resisting the motion." Seacor Holdings, Inc. v.

Commonwealth Ins. Co., 635 F.3d 675, 680 (5th Cir. 2011) (quotations and citation

omitted). It is important to note that the standard for a summary judgment is two-fold:

(1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to

judgment as a matter of law.

III.     **Law & Analysis**

    A.     **Religious Freedom Restoration Act**

In Employment Division, Department of Human Services of Oregon v. Smith, 494 U.S. 872 (1990), the Supreme Court held that the First Amendment Free Exercise Clause does not prohibit the government from burdening the exercise of religion through facially neutral laws of general applicability. Recognizing that Smith "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. § 2000bb(a)(4), Congress responded by enacting the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb, *et seq*. RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it can show "that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Id. § 2000bb-1(a)–(b). The express purpose of RFRA is "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." Id. § 2000bb(b)(1).

    *1.     Substantial Burden*

Under RFRA, Plaintiff bears the initial burden of establishing "the existence of a substantial interference with the right of free exercise." Diaz v. Collins, 114 F.3d 69, 72 (5th Cir. 1997). The sincerity of a claimant's belief in a particular religious exercise is an essential and threshold element of this burden. Tagore v. United States, 735 F.3d 324,

328 (5th Cir. 2013). RFRA broadly defines religious exercise as "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (citing 42 U.S.C. § 2000cc-5) (emphasis added). Importantly, RFRA does not invite courts to consider the centrality of the religious exercise to a claimant's faith or whether the claimant has correctly interpreted the commands of its religious beliefs. See id. § 2000cc-5(7)(A); Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 708, 715–16 (1981) ("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."). In fact, the sincerity of a claimant's engagement in a religious practice "is largely a matter of individual credibility . . . [and] is rarely challenged." Tagore, 735 F.3d at 328 (citing Moussazadeh v. Tex. Dep't of Criminal Justice, 703 F.3d 781, 791–92 (5th Cir. 2012)).

In the present case, Plaintiff has established a sincere religious belief that it cannot provide coverage for, facilitate access to, or enable the use of emergency contraceptives because they can end a human life. Plaintiff sincerely believes that any involvement in the use or provision of emergency contraceptives is a sin and is forbidden by its religion. The undisputed facts show that these beliefs are significant tenants of Plaintiff's faith. Moreover, the record shows that Plaintiff has fashioned its institutional identity and mission around its religious beliefs. Under RFRA, the inquiry then is whether the challenged regulations substantially burden Plaintiff's freedom to exercise

18

these beliefs. See Diaz, 114 F.3d at 71. If Plaintiff establishes a substantial burden on religious exercise, the onus then shifts to "the [g]overnment to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 430–31 (2006) (citing 42 U.S.C. § 2000bb-1(b))

The core of the parties' dispute in this and similar cases concerns the appropriate inquiry for determining whether the challenged regulations impose a substantial burden under RFRA:

> The issue currently dividing district courts is whether the court's inquiry is limited to the magnitude of the pressure the government exerts in compelling the plaintiffs to self-certify their objection and thereby facilitate the provision of no-cost-sharing emergency contraceptive services to their employees, as the plaintiffs contend, or whether the court may (or must) also examine from an objective perspective the nature or quality of the acts or behavior the government compels or pressures the plaintiffs to perform, as the government contends. Compare Roman Catholic Archdiocese [of NY v. Sebelius, No. 12 Civ. 2542,] 2013 WL 6579764, at *14 (E.D.N.Y. Dec. 16, 2013) ("The Court cannot say that 'the line plaintiffs drew was an unreasonable one.' Thomas, 450 U.S. at 715."), with Priests for Life [ v. U.S. Dep't of Health & Human Servs., No. 13-1261,] 2013 WL 6672400, at *10 (D. D.C. Dec. 19, 2013) (finding that "Plaintiffs have not stated a prima facie case under RFRA" because objectively viewed, completing the self-certification form was not a substantial burden.").

ETBU, 988 F. Supp. 2d at 760. While RFRA does not define the term "substantial burden," it explicitly refers to and adopts the Supreme Court's free exercise jurisprudence, which should control the analysis. Id. (citation omitted); see also 42 U.S.C. § 2000bb(b) (referencing Sherbert, 374 U.S. 398, and Yoder, 406 U.S. 205; Navajo Nation v. U.S. Forest Serv., 535 F.3d 1058, 1069 (9th Cir. 2008).

In Sherbert v. Verner, a Seventh-Day Adventist was denied unemployment benefits pursuant to a South Carolina law requiring her to show good cause for failing to accept available work because she refused to work on Saturday, the Sabbath of her religion. 374 U.S. at 399–402. All levels of state administrative and judicial review determined that her religious objections to Saturday work did not constitute good cause. Id. at 401–02. However, the Supreme Court ruled that the disqualification for benefits imposed a burden on the employee's religious exercise, and though perhaps "only an indirect result of welfare legislation within the [government's] general competence to enact," the burden was nevertheless substantial:

> [I]f the purpose or effect of a law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect. [citation omitted] Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the *pressure upon her to forego that practice is unmistakable*. The ruling *forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand*. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

Id. at 403–04 (emphasis added) (internal quotations).

The Supreme Court also found a substantial burden on religious exercise in Wisconsin v. Yoder, where members of the Amish faith were convicted and fined for violating a compulsory school-attendance law requiring them to send their children to school until age 16, despite their religious beliefs to the contrary. 406 U.S. at 208–09. The plaintiffs did not enroll their 14- and 15-year-old children in high school because they believed that formal education beyond eighth grade "was contrary to the Amish religion

20

and way of life . . . [and that it] would not only expose [plaintiffs] to the danger of the censure of the church community, but . . . also endanger their own salvation and that of their children." Id. at 209–10. The Supreme Court held as follows:

> The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law *affirmatively compels them*, under threat of criminal sanction, *to perform acts undeniably at odds with fundamental tenets of their religious beliefs*. [citation omitted] Nor is the impact of the compulsory-attendance law confined to grave interference with important Amish religious tenets from a subjective point of view. It carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent. As the record shows, compulsory school attendance to age 16 for Amish children carries with it a very real threat of undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region.

Id. at 218 (emphasis added).

In this circuit, a challenged law substantially burdens religious exercise "if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir. 2004) (defining "substantial burden" in the analog context of the Religious Land Use and Institutionalized Persons Act ("RLUIPA")).[14] The effect on religion is substantial when, for example, a law "influences the adherent to act in a way that violates his religious beliefs" or "forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious

---

[14] As the Supreme Court noted in Hobby Lobby,
> the phrase "exercise of religion," as it appears in RLUIPA, must be interpreted broadly, and RFRA states that the same phrase, as used in RFRA, means "religious exercise as defined in RLUIPA." 42 U.S.C. § 2000bb–2(4). It necessarily follows that the "exercise of religion" under RFRA must be given the same broad meaning that applies under RLUIPA.

2014 WL 2921709 at *8 n.5. See also Longoria v. Dretke, 507 F.3d 898, 901 (5th Cir. 2007) (stating that "the test under the RLUIPA is sufficiently the same as that previously imposed under RFRA").

beliefs." Id.

More broadly, courts have found a substantial burden on religious exercise if the challenged law: (1) compels the adherent to do something his religion forbids; (2) forbids the adherent from doing something his religion requires; or (3) indirectly pressures, but does not directly compel, the adherent to act in a manner forbidden by his religion, or to refrain from acting in a manner required by his religion. See, e.g., Korte v. Sebelius, 735 F.3d 654, 706 (7th Cir. 2013) (Rovner, J., dissenting) (aggregating cases into three categories of substantial burden); Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1138 (10th Cir. 2013), aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc., 2014 WL 2921709 (U.S. June 30, 2014); ETBU, 988 F. Supp. 2d at 762; see also Thomas, 450 U.S. at 717–18 (Where the government "denies such a benefit because of conduct mandated by religious belief, thereby *putting substantial pressure on an adherent* to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." (emphasis added)).

Here, it is undisputed that the accommodation requires Plaintiff to act by executing and submitting a self-certification, and that Plaintiff finds the act of self-certification religiously offensive. It is also undisputed that the regulatory tax for failing to comply with the mandate and the assessable payment for failing to offer group health insurance coverage altogether are onerous.[15] Therefore, the question here "is not whether the government is directly compelling or putting substantial pressure" on

---

[15] Although Defendants disagree with some of Plaintiff's descriptions concerning the financial penalties, Defendants do not argue that their coercive effect is insubstantial.

Plaintiff to act in a manner it finds inconsistent with the commands of its faith. ETBU, 988 F. Supp. 2d at 762. See also Zubik v. Sebelius, 983 F. Supp. 2d 576, 605 (W.D. Pa. 2013) ("The [g]overnment acknowledges that the act of self-certification will require the [p]laintiff-entities to sign the self-certification and supply a third party with the names of the [p]laintiffs' respective employees so that the third-party may provide (and/or pay for) contraceptive products, services, and counseling."). The answer to that question is clearly yes: The challenged regulations require Plaintiff to self-certify or incur onerous financial penalties.[16]

Plaintiff believes this "Hobson's choice" is a quintessential substantial burden under RFRA because the challenged regulations put substantial pressure on Plaintiff, through threat of onerous fines, to "act contrary to [its] religious beliefs by taking actions [it] deems to be impermissible facilitation of contraception." (Plaintiff's Memorandum in Support, Doc. 92 at p. 23). What matters here, Plaintiff argues, is not "whether the government believes the accommodation is adequate to dispel Plaintiff's religious objections," but whether Plaintiff has an "honest conviction" that self-certification conflicts with its religion. (Id.) (citing Korte, 2013 WL 5960692, at *22). But according to Defendants, Plaintiff's sincere belief that "the regulations impose a substantial burden on its religious exercise by requiring it to 'facilitate' access to contraception does not make it so." (Defendants' Memorandum in Support, Doc. 81-1 at p. 23).

---

[16] According to the Supreme Court, a law that forces an adherent to either forgo a benefit or abandon a precept of his religion imposes "the same kind of burden upon the free exercise of religion as would a fine imposed against" the adherent for exercising that belief. Sherbert, 374 U.S. at 405. While the Court has held that a generally applicable tax imposes no substantial burden on religious exercise, it nevertheless has recognized that an "onerous tax rate, even if generally applicable, might effectively choke off an adherent's religious practices." Jimmy Swaggart Ministries v. Bd. of Equalization of Cal., 493 U.S. 378, 392 (1990).

We are persuaded by a recent decision from our colleague in the Southern District of Texas, East Texas Baptist University v. Sebelius. In a detailed and well-reasoned opinion, Judge Lee Rosenthal considered whether a plaintiff's belief that a government-compelled act is religiously offensive controls in the context of a RFRA challenge by Baptist universities similarly situated to Plaintiff, concluding that

> Fifth Circuit case law . . . supports the conclusion that the RFRA substantial-burden inquiry does not allow the court to discard the plaintiff's view that a government-compelled or government-coerced modification is substantial. . . . [T]he unsettled issue does not appear to be whether the court must accept the plaintiffs' subjective view of whether they are compelled or pressured to act in a religiously offensive way, or whether the court must examine the nature and quality of the act to gauge whether it is offensive from some kind of objective perspective. The case law provides an answer to this question: the plaintiffs' view of whether the act is religiously offensive controls.

ETBU, 988 F. Supp. 2d at 765–66. For the reasons stated in ETBU, we reject Defendants' argument and find Plaintiff's view that self-certification is religiously burdensome controlling.

Next, Defendants contend that any burden on Plaintiff's religious exercise is at most *de minimis* "because the regulations require virtually nothing" of Plaintiff. (Defendants' Memorandum in Support, Doc. 81-1 at p. 19). In this regard, Defendants suggest that both the character of the government-compelled acts, as well as the magnitude of the religious burden, must be substantial. However, it is clear from the text of RFRA that "substantial" refers only to the *burden* imposed by the government, *not* to the conduct compelled by it. See 42 U.S.C. § 2000bb. Indeed, other district courts considering similar arguments have squarely rejected them. In Archdiocese of New York, for example, the court determined that

> [t]his argument—which essentially reduces to the claim that completing
> the self-certification places no burden on plaintiffs' religion because "it's
> just a form"—finds no support in the case law. . . . [W]here a law places
> substantial pressure on a plaintiff to perform affirmative acts contrary to
> his religion, the Supreme Court has found a substantial burden without
> analyzing whether those acts are *de minimis*.

987 F. Supp. 2d 232, 250 (E.D. N.Y. Dec. 16, 2013) (citations omitted). Likewise, in ETBU,

Judge Rosenthal observed that "[t]he Fifth Circuit considers whether a *burden* is

insubstantial, that is, the compelling or coercive mechanism itself; not whether the

modification [of behavior] is substantial. . . . The case law supports the conclusion that

the requirement of a 'substantial' burden focuses on the nature and effect of the

government restraint." 988 F. Supp. 2d at 765–66 (emphasis in original).

Nevertheless, RFRA jurisprudence is clear that if the acts Plaintiff identifies as

religiously offensive "are independent acts of third parties too far removed from [its] own

conduct, then there may be no substantial burden." Id. at 766. If, however, the

challenged regulations compel or pressure Plaintiff to "take or forebear from an action"

itself, and it is Plaintiff's "own action or forbearance that [it] find[s] religiously offensive,

there is a substantial burden" under RFRA. Id. We must therefore determine: (1) whether

what Plaintiff objects to is an act that Plaintiff *itself* is "compelled or pressured to do and

that [it was] not already doing;" and (2) whether what Plaintiff is "required to do is

sufficiently linked to what [Plaintiff itself has] identified as offensive to [its] religious

faith to be burdensome." Id. Louisiana College has shown both that the challenged

regulations compel it "to engage in an affirmative act"—the act of completing and

submitting to its group health insurance issuer a self-certification—and that it finds this

very act to be religiously offensive. Accordingly, we answer both questions in the

25

affirmative.

We begin with the first question: whether what Plaintiff objects to is an act that Plaintiff is compelled or pressured to do and one that Plaintiff was not already doing. There is no genuine dispute that well prior to the enactment of the mandate, Plaintiff directed its insurer to exclude coverage for emergency contraceptives. The parties disagree, however, as to whether self-certification requires Plaintiff to do anything more than it did previously. Defendants' position is that the challenged regulations require Plaintiff to do "next to nothing," except what Plaintiff did before their enactment or what it would do in their absence. (Defendants' Memorandum in Support, Doc 81-1 at p. 19). At least two courts have accepted this argument. See, e.g., Univ. of Notre Dame v. Sebelius, 988 F. Supp. 2d 912, 920–25 (N.D. Ind. Dec. 20, 2013), aff'd, 743 F.3d 547 (7th Cir. Feb. 21, 2014); Priests for Life, 2013 WL 6672400 at *8.

In Priests for Life, the D.C. district court held that "[t]he accommodation[ ] to the contraceptive mandate simply [does] not require [p]laintiffs to modify their religious behavior." 2013 WL 6672400 at *8. Instead, the court found it "is entirely the activity of a third party[,] namely, the issuer," to provide the objectionable services, and that the plaintiff "plays no role in that activity." Id. For that reason, it held the challenged regulations did not substantially burden the plaintiffs' religious exercise. A day after Priests for Life was decided, an Indiana district court reached the same conclusion after finding the challenged regulations did not require the University of Notre Dame to modify its own actions, which decision was affirmed on appeal. Notre Dame, 988 F. Supp. 2d at 925, aff'd, 743 F.3d 547 (7th Cir. 2014). The court explained its reasoning as

26

follows:

> [I]t is the compulsion to *act* contrary to religious beliefs that creates a substantial burden. . . . But as I see it, the act [of opting out by self-certifying] isn't changing, it's the consequence of that act that is. In other words, it's not the self-certification form that 'transforms' Notre Dame's action into one it objects to. Instead, it's what the government and the TPA do, and Notre Dame can't exercise its RFRA rights to control the actions of others.

Id. (emphasis in original).

By contrast, in ETBU, Judge Rosenthal said the challenged regulations "compel or pressure the plaintiff religious organizations themselves to perform an act that they were not already doing." 988 F. Supp. 2d at 767. In reaching this conclusion, Judge Rosenthal explained:

> The act of self-certification does more than simply state the organization's religious objection to covering or paying for its employees to get emergency contraception. The self-certification act designates the organization's TPA as the TAP for contraception coverage. The act tells the TPA or issuer that it must provide the organization's employees coverage that gives those employees free access to emergency [contraceptive] devices and products. That act tells the TPA or issuer that it must notify the employees of that benefit. . . . [T]he self-certification form requires the organizations to do much more than simply protest or object. The purpose of the form is to enable the provision of the very contraceptive services to the organization's employees that the organization finds abhorrent. The form designates the organization's chosen TPA as the administrator for such benefits and requires the organization's chosen issuer or TPA to pay for the religiously offensive contraceptive services. The purpose and effect of the form is to accomplish what the organization finds religiously forbidden and protests. If the organizations do not act in the way the accommodation requires, they face onerous fines. On January 1, 2014, the plaintiffs will be compelled or pressured to do something that they did not have to do on December 31, 2013.

Id. at 766–67. Similarly, the Archdiocese of New York court was not persuaded that the challenged regulations merely require religious organizations to instruct their TPAs not

27

to cover contraceptives, just as they did before and would do without the mandate, because "the self-certification would still transform a voluntary act that plaintiffs believe to be consistent with their religious beliefs into a compelled act that they believe forbidden. Clearly, plaintiffs view the latter as having vastly different religious significance than the former." 987 F. Supp. 2d at 251. In both decisions, the district courts accepted the plaintiffs' characterization of self-certification as facilitation of immoral conduct. The Zubik court likewise accepted the plaintiffs' belief that self-certification equates to "facilitat[ing]/initiat[ing] the provision of contraceptive products, services and counseling" in concluding that the challenged regulations substantially burden the religious exercise of religious nonprofits associated with two exempt Catholic dioceses. 983 F. Supp. 2d at 605.

In the instant case, Louisiana College has the same religious belief that facilitating free access to emergency contraceptives is just as sinful and immoral as providing that access directly as did the plaintiffs in Zubik, Archdiocese of New York, and ETBU. Like those courts, we accept Plaintiff's characterization of its beliefs because to hold otherwise would be to question whether Plaintiff has correctly interpreted "the commands of [its] common faith," which the Supreme Court has cautioned against. Thomas, 450 U.S. at 716. Moreover, for the reasons stated in ETBU and Archdiocese of New York, we find the challenged regulations compel or pressure Plaintiff to perform an act it was not doing previously.

We also reject Defendants' suggestion that the determination of whether a government-compelled act is religiously burdensome depends on how much time or

effort is involved in performing the act. The fact that self-certification may only take "a matter of minutes" does not render the burden insubstantial. See, e.g., ETBU, 988 F. Supp. 2d at 768 ("It is insufficient to dismiss or discount the plaintiffs' religious objection to the act or forbearance based on the amount of work involved, as long as an act or forbearance on the plaintiffs' part is compelled or coerced by the government, including by the threat of large fines."); Archdiocese of N.Y., 987 F. Supp. 2d at 249 ("This argument—which essentially reduces to the claim that completing the self-certification places no burden on plaintiffs' religion because 'it's just a form'—finds no support in the case law."); Zubik, 983 F. Supp. 2d at 605 ("[T]he [c]ourt disagrees with the [g]overnment that [p]laintiffs' ability or inability to 'merely sign a piece of paper,' and thus comport with the 'accommodation,' is all that is at issue here."). In this case, we would go so far as to say that self-certification is vastly more than a mere "administrative" act. Rather, the challenged regulations and their application trigger a subterfuge requiring indirect *action* the regulations could not do if they applied to Plaintiff directly.

Turning to the second question of the connection between Plaintiff's own act and the religiously offensive result, Defendants assert that the actions Plaintiff finds objectionable are independent actions of third parties—namely, its employees' use of emergency contraceptives. Defendants further contend that Plaintiff's conduct is separated from these third-party acts "by 'a series of events' that must occur before the use of [emergency] contraceptives . . . 'would come into play,'" and by the fact that the insurance issuer, rather than Plaintiff, "will actually contract, arrange, pay, and refer for

29

such services." (Defendants' Memorandum in Support, Doc. 81-1 at p. 26). Thus, Plaintiff's "coerced" act of self-certification is too far removed from the use of emergency contraceptives by its employees to impose a substantial burden on the free exercise of religion. (Id. at 18). In addition, Defendants aver that Plaintiff wants to prevent anyone else from providing emergency contraceptives to its employees.

These arguments are similarly flawed. Although Defendants are correct that Plaintiff objects to the use of emergency contraceptives on religious grounds, their argument overlooks the fact that Plaintiff also objects "to being required to actively participate in a scheme to provide such services." Archdiocese of N.Y., 987 F. Supp. 2d at 250. Despite Defendants' suggestion to the contrary, Plaintiff acknowledges that a government-scheme to provide free coverage of emergency contraceptives that does not involve Plaintiff would not violate its religious exercise under RFRA. Plaintiff does not agree, however, that the current accommodation scheme sufficiently insulates it from the immoral provision or use of emergency contraceptives, and, as we stated previously, it is not for this Court to say Plaintiff is wrong about its beliefs. See Thomas, 450 U.S. at 715 ("Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs.").

The Zubik court rejected a similar attenuation argument, holding that

> although the "accommodation" legally enables [p]laintiffs to avoid directly paying for the portion of the health plan that provides contraceptive products, services, and counseling, the "accommodation" requires them to shift the responsibility of purchasing insurance and providing contraceptive products, services, and counseling, onto a secular source. The [c]ourt concludes that [p]laintiffs have a sincerely-held belief that "shifting responsibility" does not absolve or exonerate them from the moral turpitude created by the "accommodation"; to the contrary, it still substantially

burdens their sincerely-held religious beliefs.

983 F. Supp. 2d at 606. Likewise, our colleague in the Southern District of Texas determined that, while the act of self-certification is not sufficient for an organization's employees to achieve free access to emergency contraceptives, self-certification is "necessary to this result, and that is enough for RFRA." ETBU, 988 F. Supp. 2d at 768.[17]

Judge Rosenthal explained the causal link between the plaintiffs' self-certification and the morally objectionable result as follows:

> Both the TPA and issuer provide coverage and payment because the plaintiffs self-certify their unwillingness to do so through the plan itself. But the plaintiffs' employees can obtain such coverage and payment only as long as they are the plaintiffs' employees and on the plaintiffs' group health plan. It is the insurance plan that the religious-organization employer put into place, the issuer or TPA the employer contracted with, and the self-certification form the employer completes and provides the issuer or TPA, that enable the employees to obtain the free access to the contraceptive devices that the plaintiffs find religiously offensive.
>
> Even accepting that the government has succeeded in preventing any payment by the religious organization for the religiously offensive devices, there is a causal link between the acts the plaintiffs must do under the accommodation and the provision of contraceptive devices and products to employees on a no-cost-sharing basis. The effort to accommodate the religious organizations by reducing their involvement in providing their employees with such access to emergency contraception did not end the plaintiffs' involvement so as to avoid required acts on their part that offend their faith.

---

[17] See also, e.g., Korte, 735 F.3d at 685 (rejecting similar attenuation argument and stating that "the judicial duty to decide substantial-burden questions under RFRA does not permit the court to resolve religious questions or decide whether the claimant's understanding of his faith is mistaken." (citation omitted));  Hobby Lobby, 723 F.3d at 1142 ("[T]he question here is not whether the reasonable observer would consider the plaintiffs complicit in an immoral act, but rather how the plaintiffs themselves measure their degree of complicity." (citation omitted)); S. Nazarene Univ. v. Sebelius, No. 13-cv-1015, 2013 WL 6804265, at *8, n.4 (W.D. Okla. Dec. 23, 2013) ("The self certification is, in effect, a permission slip which must be signed by the institution to enable the plan beneficiary to get access, free of charge, from the institution's insurer or third party administrator, to the products to which the institution objects. If the institution does not sign the permission slip, it is subject to very substantial penalties or other serious consequences. If the institution does sign the permission slip, and only if the institution signs the permission slip, institution's insurer or third party administrator is obligated to provide the free products and services to the plan beneficiary.").

Id. at 768–69. See also Catholic Diocese of Beaumont, 2014 WL 31652 at *8 ("Submitting the self-certification affidavit is not simply espousing a belief that [p]laintiffs hold. It is defined as an authorization for the TPA to provide coverage. It enables the exact harm that [p]laintiffs seek to avoid, harm that [p]laintiffs find religiously forbidden."). Based on these decisions, we find that the government-compelled act of self-certification is sufficiently linked to what Plaintiff has identified as offensive to and burdensome on its religion: facilitating its employees' free access to emergency contraceptives.

One other point, not necessarily present in the other cases, is compelling in this one. As we observed above, the GuideStone Plan, which would be required under the accommodation to provide the contraceptive services in question, is itself a creature of and adjunct to the SBC. The effect, then, of Plaintiff's execution of the "purely administrative" form triggers payment for these objectionable services by GuideStone. Defendants' position that merely filling out a form imposes no substantial burden on religious exercise is particularly blinded to even the existence of the integral, faith-based relationship between and among the SBC, GuideStone, and Plaintiff. This relationship cannot be ignored in the picture and the playing out of the free exercise affiliations and the effects of the Act in this unusual situation.

In conclusion, because both failing to comply with the mandate and failing to provide group health insurance coverage altogether will result in onerous financial penalties, the only option available to Plaintiff is to violate its religious beliefs, either by providing coverage for emergency contraceptive services via its own affiliated GuideStone Plan, or by facilitating free access to such services through a self-certification

form. Accordingly, there is no genuine dispute of material fact that the challenged regulations substantially burden Plaintiff's free exercise of religion under RFRA.

2.   _Least Restrictive Means of Furthering a Compelling Interest_

RFRA states that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb–1(b).

Defendants' burden under RFRA is twofold: (1) that the mandate furthers an interest of the "highest order;" and (2) that the mandate is the least restrictive means of advancing that interest. Yoder, 406 U.S. at 215 (deciding that the state's interest in universal compulsory education, while strong, is not "absolute to the exclusion or subordination of all other interests"). See also 42 U.S.C. § 2000bb-1(b). Moreover, RFRA requires Defendants to show "that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." O Centro, 546 U.S. at 419–20 (citing 42 U.S.C. § 2000bb-1(b)). In scrutinizing this claim, the Court must "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." Id. at 431. It bears mentioning that, when confronted with markedly similar arguments to those advanced by Defendants here, every court to reach this issue in a case involving a religious nonprofit similarly situated to Plaintiff, and of which this Court is aware, has observed that the mandate and accommodation fail RFRA's compelling

33

interest test.[18]

The "compelling governmental interests" identified by Defendants in this case are two-fold: (1) promotion of public health; and (2) assuring that women have equal access to preventive healthcare services. According to Defendants, the mandate advances these interests by making emergency contraceptives readily available to women, which will reduce unwanted pregnancies and related health problems for women and will remove the cost-barrier that results in women being placed at a competitive disadvantage to men because they are forced to forego preventive care. However, courts have noted that

> [b]y stating the public interests so generally, the government guarantees
> that the mandate will flunk the test. [The compelling interest test] requires
> a substantial congruity—a close "fit"—between the governmental interest
> and the means chosen to further that interest. Stating the governmental
> interests at such a high level of generality makes it impossible to show that
> the mandate is the least restrictive means of furthering them. There are
> many ways to promote public health and gender equality, almost all of them
> less burdensome on religious liberty.

Korte, 735 F.3d at 686. The government cannot prevail under RFRA by identifying "'broadly formulated interests' that justify the 'general applicability of government mandates.'" ETBU, 988 F. Supp. 2d at 769 (quoting Hobby Lobby, 723 F.3d at 1143). Instead, it must show with particularity how granting the requested exemption would

---

[18] See, e.g., Archdiocese of St. Louis v. Burwell, No. 13-cv-02300, 2014 WL 2945859, at *9–10 (E.D. Mo. June 30, 2014); Brandt v. Burwell, No. 14-cv-00681, 2014 WL 2808910, at *6 (W.D. Penn. June 20, 2014); Colo. Christian Univ. v. Sebelius, No. 13-cv-02105, 2014 WL 2804038, at *8 (D. Colo. June 20, 2014); Dobson v. Sebelius, 13-cv-03326, 2014 WL 1571967, at *9–10 (D. Colo. April 17, 2014); Archdiocese of Atlanta v. Sebelius, 1:12-cv-03489, 2014 WL 1256373, at *17–18 (N.D. Ga. Mar. 26, 2014); Ave Maria Found. v. Sebelius, 13-cv-15198, 2014 WL 117425, at *7 (E.D. Mich. Jan. 14, 2014); Catholic Diocese of Beaumont, 2014 WL 31652 at *8; ETBU, 988 F. Supp. 2d at 769–71; Diocese of Fort Wayne-S. Bend, Inc. v. Sebelius, No. 1:12-cv-159, 2013 WL 6843012, at *15–17 (N.D. Ind. Dec. 27, 2013); Grace Schs. v. Sebelius, No. 3:12-cv-459, 2013 WL 6842772, at *14–16 (N.D. Ind. Dec. 27, 2013); S. Nazarene Univ. v. Sebelius, No. 13-cv-1015, 2013 WL 6804265, at *9–10 (W.D. Okla. Dec. 23, 2013); Geneva Coll. v. Sebelius, No. 12-cv-0207, 2013 WL 6835094, at *11–14 (W.D. Pa. Dec. 23, 2013); Roman Catholic Archdiocese of NY, 987 F. Supp. 2d at 252–57; Zubik, 983 F. Supp. 2d at 612. See also Diocese of Cheyenne v. Sebelius, No. 14-cv-21, 2014 WL 1911873, at *11 (D. Wyo. May 13, 2014).

adversely affect even an admittedly strong interest. <u>O Centro</u>, 546 U.S. at 431.

Plaintiff does not seriously dispute that the stated interests are compelling. Instead, Plaintiff suggests that Defendants cannot show how granting Plaintiff a limited religious exemption only from the four contraceptive methods that may prevent fertilized eggs from implanting in the uterine wall would undermine these interests, and we agree. According to Defendants,

> [h]ouses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers, including organizations eligible for the accommodations, to employ people of the same faith who share the same objection, and who would therefore be less likely to use contraceptive services even if such services were covered under their plan.

(Defendants' Memorandum in Support, Doc. 81-1 at pp. 32–33). Yet, Plaintiff has shown it employs individuals who share its religious views regarding emergency contraception and are therefore "less likely to use contraceptive services even if such services were covered under their plan." (<u>Id.</u> at 32). Moreover, the record does not justify Defendants' argument that granting Plaintiff "the much broader exemption it requests" would undermine the government's ability to enforce the regulations effectively. (<u>Id.</u> at 33). As Judge Rosenthal articulated in <u>ETBU</u>,

> [t]hat argument depends on a showing that uniformity is critical such that granting the requested exemptions would undermine effective administration. <u>See, e.g.</u>, <u>United States v. Lee</u>, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (rejecting a claimed exception to the obligation to pay Social Security taxes in part because "mandatory participation is indispensable to the fiscal vitality of the social security system" and that the "tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief."); <u>Hernandez v. Commissioner</u>, 490 U.S. 680, 700, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). There are two problems with applying this argument to the religious exemption the plaintiffs seek.

> First, there are many secular and religious exemptions already built into the ACA. Although the government justifies each, such as the exemptions for grandfathered plans and for statutorily defined religious employers (as opposed to religious nonprofit organizations), the number of exemptions seems inconsistent with a showing that granting the exemption the plaintiffs seek would undermine administrative efficacy. This is different from holding, as some courts have, that the existence of secular exemptions, such as for grandfathered plans or for small employers, undermines the government's ability to show that it is protecting a compelling interest in refusing an additional, religious exemption. See, e.g., Korte, 735 F.3d at 686; Gilardi [v. U.S. Dep't of Health & Human Servs.], 733 F.3d [1208,] 1222–23 [(D.C. Cir. 2013)]. The fact that there are other exemptions does not in itself preclude the government from being able to show a compelling interest in applying the law to a particular religious organization or claimant. The point here is that if the government is opposing a RFRA exemption by asserting a general need for uniformity, the existence of a number of exemptions makes that more difficult. More important, the government's argument for uniformity does not depend on any specific showing relating to the ACA or the accommodation. Rather, it is based on general slippery-slope concerns that could be raised in response to any RFRA claim to an exception to a generally applicable law. Categorically relying on a need for uniformity is not sufficient under RFRA, but it is what the government has done here.

988 F. Supp. 2d at 769 n.8. Defendants have offered absolutely no evidence to support their contention that granting Plaintiff the exemption it requests would have any impact at all on the government's ability to enforce the mandate.

But even if we assume the stated interests in guaranteeing cost-free access to emergency contraceptives are compelling, Defendants must also show that the mandate, in light of the accommodation, is the "least restrictive means" for furthering these interests. Again, we are guided by the well-reasoned opinion in ETBU:

> The courts have identified several "less restrictive means" of serving the interests the government has identified than a total denial of the religious exemption request. One is to have the government provide the contraceptive services or coverage directly to those who want them but cannot get them from their religious-organization employers. See, e.g., Korte, 735 F.3d at 686. If the numbers seeking such services is small because of the organizations' emphasis on hiring employees who subscribe

36

to the same religious beliefs, the added tax consequence to the public from the religious-organization employers' refusal to pay would also be reduced. See Lee, 455 U.S. at 252 (rejecting a religious exemption from the tax laws on the basis that it would be too burdensome on taxpayers generally to pay taxes for those refusing to do so). Another alternative would be to have the government work with third parties to provide emergency contraception without requiring the plaintiffs' active participation. Korte, 735 F.3d at 686. Still another alternative could be to have the employee self-certify on an as-needed basis that their employer is a religious nonprofit that does not provide coverage for such services.

988 F. Supp. 2d at 770.

Here, in addition to the alternatives identified by the courts, Plaintiff has identified other, less burdensome means for furthering the government's stated interests, such as providing tax deductions, refunds, or credits to employees who must purchase emergency contraceptives. Defendants claim they considered these alternatives "and determined that they were not feasible because the agencies lacked statutory authority to implement them; they would impose considerable new costs and other burdens on the government; and they would otherwise be impractical." (Defendants' Memorandum in Support, Doc. 81-1 at p. 35). Defendants also directed the Court's attention to a specific section of the Administrative Record, which reads, in pertinent part, as follows:

> [S]ome commenters asserted that the contraceptive coverage requirement is not the least restrictive means of advancing these compelling interests, and proposed various alternatives to these regulations. All of these proposals were considered, and it was determined that they were not feasible and/or would not advance the government's compelling interests as effectively as the mechanisms established in these final regulations and the preventive services coverage regulations more generally.

78 Fed. Reg. at 39,888. However, "[t]he regulation itself clearly announces that the alternatives to the current regulations—including the contraceptive mandate—would not advance the [g]overnment's interests 'as *effectively* as' the contraceptive mandate and

37

the 'accommodation.' Greater efficacy does not equate to the least restrictive means."
Zubik, 983 F. Supp. 2d at 612 (emphasis in original). For these reasons, we find that
Defendants have failed to meet their burden under RFRA.

In sum, Plaintiff has shown the absence of a genuine dispute of material fact that
the challenged regulations substantially burden its religious exercise, and Defendants
have failed to show that the challenged regulations are the least restrictive means of
advancing a compelling governmental interest. Accordingly, Plaintiff is entitled to
summary judgment on its RFRA claim. Defendants' motion for summary judgment on the
absence of a RFRA violation will therefore be denied.

### B.    Constitutional Claims

In addition to the RFRA claim, Plaintiff asserts various claims under the First and
Fifth Amendments. Under well-settled principles of constitutional law, this Court should
not decide constitutional issues if the case can be disposed of on other, non-constitutional
grounds. Teltech Sys., Inc. v. Bryant, 702 F.3d 232, 235 (5th Cir. 2012) (quoting Ashwander
v. TVA, 297 U.S. 288, 347 (1936)). For the reasons discussed above, we have concluded
that Plaintiff is entitled to judgment as a matter of law on its RFRA claim, and this
resolution precludes the need to rule on Plaintiff's remaining constitutional claims.
Therefore, Plaintiff's First and Fifth Amendment claims will be dismissed.

### C.    Administrative Procedure Act

Finally, Plaintiff alleges violations of the Administrative Procedure Act, 5 U.S.C. §
500, *et seq*. As discussed above, however, we have found the challenged regulations
themselves violate Plaintiff's rights under RFRA, and this conclusion does not depend on

an analysis of the APA. To make clear that the Court is entering a final judgment, Plaintiff's APA claim will also be dismissed.

## IV.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss and for Summary Judgment (Doc. 81) will be **DENIED in PART** and Plaintiff's Cross-Motion for Summary Judgment (Doc. 91) will be **GRANTED in PART** insofar as they pertain to Plaintiff's RFRA claim, which will be **DISMISSED WITHOUT PREJUDICE**. In all other respects, both motions will be considered **MOOT**. Disposition will follow by separate judgment.

SIGNED on this _13_ day of August, 2014 at Alexandria, Louisiana.

DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT